**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON SALEM DIVISION**

IN RE:

ALEVO MANUFACTURING, INC., *et al.*,   CASE NO. 17-50877
                                        (CONSOLIDATED FOR PURPOSES OF
    DEBTORS.                           ADMINISTRATION ONLY)
                                        CHAPTER 11

**MOTION FOR APPROVAL OF PRIVATE SALE OF ASSETS OF ALEVO ANALYTICS**
**AND ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS**

    COMES NOW the Debtor Alevo USA, Inc. (the "Debtor"), by and through undersigned counsel, and hereby files its motion for approval under section 363 and 365 of the Bankruptcy Code for approval of the sale of certain assets and contracts that comprise "Alevo Analytics" and in support thereof, shows as follows:

**JURISDICTION AND VENUE**

    1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

    2.    The statutory predicate for the relief sought in this Motion is Sections 363 and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code").

**BACKGROUND**

    3.    On August 18, 2017 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Cases").

    4.    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee, trustee, or examiner has been appointed in these cases.

5. Alevo Manufacturing, Inc. ("Manufacturing") and Alevo USA, Inc. ("USA") began operations in Concord, North Carolina in 2014. Manufacturing is engaged in the production of grid-scale energy management solutions. Manufacturing provides these solutions through the Alevo GridBankTM ("GridBank"), a patented battery-based energy storage technology. The GridBank is comprised of nonflammable electrolyte batteries which provide energy storage services that support the efficiency and reliability of electric generation, distribution and transmission as well as integration of renewable generation resources. The energy storage systems are scaled, designed and engineered to provide applications such as frequency regulation, peak shifting, ramp support, load following and/or other ancillary services to increase the reliability of electricity delivery. The goal of the Debtors is to deliver affordable, grid-scale electricity when and where it is needed. Their customer base is global in scope.

6. USA works from the same location as Manufacturing and has provided administrative and financial support for Manufacturing, USA also owns Alevo Analytics, an advisory service, which leverages proprietary software and a supercomputer system to quickly calculate the optimum placement and operation of GridBank for maximum economic benefit to end users.

7. USA leases Victory Industrial Park ("VIP") a 1,600 acre campus that formerly housed a large Philip Morris cigarette-manufacturing site. VIP contains approximately 2.5 million square feet of manufacturing space and an additional one million square feet of warehousing capacity. At this time, USA and Manufacturing occupy approximately 10%-15% of the usable square footage of the facility.

8. Specialized production lines for GridBank have been constructed in Concord from equipment imported from Germany. The production process requires safety measures to deal with flammable acetone utilized in the cathode mixing process, liquid and gas sulfur dioxide, and a corrosive

and acidic electrolyte. Additionally, the process requires scrubber controls utilizing caustic materials to neutralize waste.

9. Sulfur Dioxide is present in the batteries and in storage tanks on the premises, and this chemical is lethal if not handled properly. Thus, the Debtors must maintain 24 hour monitoring of the batteries and tanks. Environmental permits were obtained by the Debtors regarding the chemicals on hand and how they are handled.

10. The parent of USA and Manufacturing is Alevo International SA ("International") a Swiss company. The ultimate parent company is Alevo Group SA ("AG") which is based in Switzerland and has a research facility in Germany.

11. The Debtors have not generated sufficient revenue to support their operations, thus they have been continuously dependent on International and AG for loans to support their business. There have been several investors that have provided funding to AG, which was then down-streamed to its various subsidiaries to support operations. Unfortunately, the key investor that advocated for continuance of the United States operations was unable to bring sufficient new investment in time to avoid the chapter 11 filings. Alevo Group SA may also be seeking relief under the Swiss bankruptcy process.

12. One of the assets of the Debtor is called "Alevo Analytics." Alevo Analytics provides grid and storage usage analysis and studies for customers, as well as providing software programming and SCADA configuration for energy storage systems such as Alevo's GridBank.

13. The main assets of Analytics on the Petition Date were 4 consulting contracts totaling $332,732 in net collectable revenue as set forth on Exhibit A[1] and 108 servers which provide unique computing capacity. The servers require reconfiguration as the interlinking networking cards are no longer supported from the card manufacturer.

---

[11] Alevo Analytics has one agreement by which it provides services but the contract is not profitable, and the Debtor will seek to reject the contract.

14. Alevo Analytics had 10 employees at the time of filing. As part of the general lay-offs for Alevo USA, Inc. on the Petition Date, all Analytics employees were released from their positions.

15. The primary assets of Alevo Analytics are revenue contracts which are dissipating assets by their very nature and each day that Alevo Analytics is unable to service the executed contracts, the likelihood increases that the customers will seek approval to locate services elsewhere.

16. The former employees of Alevo Analytics are likely to seek new jobs if they are not employed by a successor business in the near future. Thus, time is of the essence to complete a sale process if any value is to be extracted for the assets in order to benefit the Debtor and its creditors.

17. After the chapter 11 filing, Peter Heintzelman, President of the Debtor has consulted various parties regarding purchase of Alevo Analytics before its value is totally lost. The parties consulted have been: 1) Randell Johnson, former Chief Analyst of Alevo, who was the head of Analytics up to the filing date; 2) Enovation Partners ("Enovation"), a consulting company unrelated to Alevo, which is in the business of storage studies and other consulting services to the power industry; 3) CES [Consulting], an unrelated consulting firm also in the business of power related consulting and data services; 4) CES is a partner to Alevo in the operation of Snook EE, LLC (a subsidiary of the Debtor) and other planned site developments; and 5) Alevo Group, SA, the ultimate parent of Alevo USA, Inc.

18. While Alevo Group and CES were not interested in making a bid for the assets of Alevo Analytics, Randell Johnson demonstrated interest but submitted a bid of 'zero' which was clearly not acceptable. Alevo Group, SA does not have the funds at this time to purchase Alevo Analytics from the Debtor.

19. Enovation, however, invested a significant amount of time evaluating the executed contracts, the receivables still available from contracted customers and evaluated the not-yet-signed contracts and the business development pipeline of the company. Enovation also interviewed all

employees with the exception of Randall Johnson (who will not be employed if a sale is approved). Enovation made two trips to the Debtor's premises with a team of five individuals to inspect the physical assets, the computer servers, and re-interview employees.

20. On August 31, 2017, Enovation presented a letter of intent to the Debtor (attached as Exhibit A) for the purchase of substantially all assets of the Alevo Analytics and intends to hire the majority of the employees interviewed and will be able to keep them in the Charlotte area. The proposed purchase price is $200,000. The contracts which Enovation proposes to assume are attached as Exhibit B.

21. If this offer is not approved by September 8 and closed immediately, Enovation's offer will decrease significantly.

22. The Debtor supports the offer of Enovation because it is an arm's length transaction which provides value for a rapidly depleting value considering that Alevo Analytics is a service division requiring actions to be undertaken to avoid major disruption of business.

23. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." The Debtor, as a debtor-in-possession, has the rights of a trustee and under section 363 seeks approval of the sale of its assets and assumption and assignment of the contracts discussed herein under section 365 of the Bankruptcy Code. The Debtor and Enovation will discuss the proposed sale with all parties to contracts and try to provide their consent to the assumption and assignment at the hearing on this motion or evidence of Enovations ability to provide adequate assurance of performance will be provided.

24. Section 363(f) of the Bankruptcy Code provides authority for this Court to provide approval of the sale free and clear of all liens, claims, interests and encumbrances transferred to

proceeds of sale. At this time, the only know lien is help by Alevo Group, SA, and upon information and belief, Alevo Group SA will consent to the sale free of its lien

25. Debtor believes that the value of its assets will be maximized through the contemplated sale, and that the purchase price is fair, reasonable, and in the best interest of the estate.  A substantial portion of the purchase price is attributable to the going concern value of the business, and a forced liquidation of the assets would likely provide far less.  Further, to the extent existing contracts are assigned to the Purchaser, the estate will be protected against potential contract rejection claims.

WHEREFORE, the Debtor requests an order of the Court allowing the proposed sale of Alevo Analytics, free and clear of liens for the price set forth herein, allowing the assumption and assignment of the contracts as specified and finding that Enovation is a bona fide purchaser for value and a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and that none of the grounds set forth in section 363(n) exist with respect to the sale.

Respectfully submitted this 1st day of September, 2017.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Terri L. Gardner*
Terri L. Gardner
N.C. State Bar No. 9809
4140 Parklake Avenue
GlenLake One, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 329-3882
Facsimile: (919) 329-3799
Email: terri.gardner@nelsonmullins.com

*Counsel for Alevo USA, Inc. and Alevo Manufacturing, Inc.*

# EXHIBIT A

## *CONFIDENTIAL DRAFT*

### LETTER OF INTENT

This Letter of Intent sets forth, as of September 1, 2017, the general terms and conditions on which Enovation Partners LLC (the "**Buyer**") has an interest in acquiring substantially all the assets of Alevo Analytics (the "**Acquisition**"), a division of Alevo USA Inc. (the "**Seller**") . This Letter of Intent reflects the parties' understanding of the matters described below, but is not intended to constitute either a complete statement of the terms and conditions of the proposed transaction or a legally binding or enforceable agreement or commitment on the part of either Buyer or Seller.

*Intent Supporting the Transaction:*

For Alevo USA:

1. Effect a rapid and smooth transition of the Analytics division's clients and employees to capture the remaining value of the business and mitigate any financial, legal, and reputational risk;
2. Receive an immediate and appropriate cash payment;

For Enovation:
1. Enhance the capabilities and grow the revenue of Enovation's Analytics practice, which has a significant focus on distributed energy resources, including storage;
2. Acquire the assets and intellectual property of Alevo Analytics and recruit and retain the team needed to honor current commitments to Alevo Analytics' clients and pursue additional opportunities.

*Structure of Transaction:*   Buyer will acquire, all of Seller's tangible and intangible assets of Alevo Analytics, including, without limitation, all of Seller's accounts receivable, work in process, previous work product, equipment, intellectual property (including software tools, algorithms, web interfaces, APIs, optimizations that have been developed in-house), client lists, databases, contract rights, licenses, relationships, trademarks, branding and marketing materials, know-how, domain names, reports, newsletters, blogs, Alevo Analytics computers, servers, and other dedicated technology allocated to the department and its employees, laptops and cell phones, website, efforts in various stages of business development, and any other assets that are necessary or useful for the operation of Seller's Analytics businesses unit. This includes the 108 SuperMicro servers configured for serial processing and related hardware and software, as well as ten 'enterprise quality' operational Dell laptops of 2017 vintage in addition to those assigned to the department. Unless otherwise mutually agreed,

| | |
|---|---|
| | Buyer will not acquire any of Seller's liabilities, except for (i) post-closing liabilities resulting from the assumed contracts, limited to the revenue from the contracts, and (ii) specifically scheduled and agreed to ordinary course accounts payable obligations, with liability limited to the respective payable amounts. |
| *Definitive Agreement:* | The obligations of Buyer and Seller to consummate the Acquisition are subject to the execution of a definitive and binding asset purchase agreement (the "**Definitive Agreement**") among Buyer and Seller, in form and substance satisfactory to the parties and their respective counsel. |
| *Purchase Price:* | In consideration for the purchase of the assets, Buyer will a make cash payment of $200,000, if this acquisition is approved by September 8, 2017. After that date, Buyer will make a payment of $70,000, due to the diminished value of contracts. |
| *Employee Arrangements:* | Buyer and Seller shall enter into an agreement to make the transaction smooth for Seller's former employees, customers, and key contacts. Buyer will interview and is motivated to hire, but shall not be obligated to hire, specific Seller employees. If hired, Buyer plans on Charlotte-based employees to remain in the area |
| *Closing:* | The date of the closing for the Acquisition will be mutually agreed upon by Buyer and Seller, but is expected to be no later than September 18, 2017. |
| *Closing Conditions:* | It is currently contemplated that the closing of the Acquisition will depend upon Buyer receiving sufficient access to information for diligence, and Seller receiving the necessary approvals. |
| | The preliminary provisions described in this Letter of Intent are based on information available to the parties upon the date of this document. Any (i) material adverse change in the business, assets, condition, or prospects of the Seller, (ii) dissatisfactory results of due diligence review, (iii) failure to obtain all third party or governmental consents or approvals necessary or desirable to facilitate the Acquisition, or (iv) failure to meet other conditions customary or appropriate for transactions of this type may affect one or more terms contemplated in this Letter of Intent. |
| *Due Diligence:* | Buyer will commence its due diligence review as soon as reasonably practicable, which review must be completed to Buyer's complete satisfaction. Seller will give Buyer and its representatives reasonable access to all of Seller's information, records, facilities and employees. |

| | |
|---|---|
| *Interim Performance:* | For the period from the execution of this Letter of Intent to the Termination Date (as defined below), Seller will not, without the prior written consent of Buyer allow other outside parties to access the source code, databases, servers, and internally developed software. Seller, at a time directed by Buyer, will also provide written communication to recent clients and prospects that an exclusive negotiation is underway with Buyer to transition the contracts and assets associated with Alevo Analytics, in order to preserve any potential value in the contracts, and minimize liability |
| *Confidentiality:* | The parties agree that the existence and content of this Letter of Intent will not, without the mutual permission of Buyer and Seller, be disclosed to any other person or entity, other than, on a confidential basis, to the parties' respective professional advisors, stockholders and/or financing sources and Seller's representatives in its Bankruptcy proceedings. |
| *Exclusivity:* | Commencing with the execution of this Letter of Intent, Seller shall not, directly or indirectly, through its affiliates, agents, stockholders, officers, directors or otherwise, (1) solicit, initiate, participate in discussions or negotiations or otherwise cooperate in any way with, or provide any information to any person, entity or group other than Buyer concerning sale of assets covered in this agreement. This exclusivity provision shall remain in effect until the earlier of (i) September 15, 2017 and (ii) the execution and delivery by the parties hereto of the Definitive Agreement (the **"Termination Date"**); provided that, the Termination Date shall automatically be extended for additional, successive seven (7) day periods, unless either party has delivered to the other party a written notice of termination at least three (3) business days prior to the expiration of the Termination Date (as extended pursuant to the foregoing). |
| *Expenses:* | Whether or not the Acquisition is consummated, each party shall pay its own costs and expenses (including fees and disbursements of consultants, investment bankers and other financial advisors, brokers and finders, counsel and accountants). |
| *Legal Effect:* | This Letter of Intent is intended to serve as a statement of the current intentions of the parties and, to the extent the parties desire to proceed with the Acquisition, as a guide to Buyer's counsel in drafting the Definitive Agreement. This Letter of Intent is not to be considered a complete integration of any agreements or to create any binding obligations on either party hereto except for the terms set forth in *"Interim Performance," "Confidentiality," "Exclusivity," "Expenses,"* and *"Legal Effect"* which shall constitute binding obligations. Any other binding obligations of |

- 3 -

Seller and Buyer will only be created by the Definitive Agreement after approval of the transactions by the Seller and Buyer. This Letter of Intent will be governed by the laws of the State of Delaware, without regard to its principles of conflicts of laws.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Letter of Intent to be executed as an agreement under seal as of the date first written above.

**Enovation Partners LLC**

*/s/ Robert Zabors*

By: Robert Zabors
Its: Managing Member and CEO


**On behalf of Seller:**

_____
By:
Its:

Enovation Partners LLC – HIGHLY CONFIDENTIAL
Enovation Partners LLC – HIGHLY CONFIDENTIAL

SUMMARY OF KEY TERMS
CONFIDENTIAL – 8/31/17

CONTRACTS

*Mutual goal of smooth transition of customer relationships and fulfillment of existing projects*

- All current and client-executed contracts and purchase orders of Alevo Analytics. These are believed to be with IRENA, NRC, NYSERDA, SmartWires, BELCo, National Grid Ventures, and others. Buyer liability is limited to the contracted amount.
- Payments received from clients for uncompleted work
- All contracts in discussion or proposal phase

ASSETS

*Assets related to customers and contracts, and those needed to deliver existing projects including hardware and software, the IP, licenses, and marketing assets of the business*

- All current work product and prior client workpapers
- All intellectual property, software, databases, source code, licenses (incl. MATLAB, Plexos, PSSE), marketing material and data, website content
- All computer hardware – servers, laptops, supporting equipment, leases, licenses, and software. This includes the 108 servers of the SuperMicro 'supercomputer' installation, including the hardware and software used in its operation as configured.
- Ten additional recent vintage enterprise quality operational Dell laptops
- Accounts receivable for uncompleted work, and administrative data and assets needed to support future operations (eg HR data, warranties, insurance policies)

PEOPLE

*While employment contracts are assumed to have been voided by the bankruptcy filing, Enovation will interview the majority of Analytics former employees and attempt to hire as many as fit the needs of the combined business. Rapid hiring may mitigate market and litigation exposure of Alevo (e.g. damages under WARN)*

PURCHASE CONSIDERATION

- Cash at closing: $200,000, if closing occurs by 9/8/17; $70,000 if closing after 9/8/17

TIMING

- Closing ASAP, no later than mid-September, due to the rapidly diminishing value of customer contracts and relationships, and employee considerations

CONTINGENCIES

- Customary diligence and access
- Access on-site to the team room for up to two weeks to support diligence, client contracts and requests, and Alevo Energy's request for SCADA system monitoring and coding

CONDITIONS

- Exclusivity through September 15, 201

- 5 -

# **EXHIBIT B**

Material contracts in force

| Status | Date | Term | Contract Value | Remaining Value | Company Name | Address | City, St, Zip | Contact | Phone |
|---|---|---|---|---|---|---|---|---|---|
| Ongoing | 10/11/2016 | One Year | $ 25,000.00 | $ 2,000.00 | Bermuda Electric Light Company Limited | 27 Serpentine Road | Pembroke HM 07, Bermuda | Dewton E Williams | |
| Ongoing via PO Svcs agmt | 7/12/2017 | 7/12/17 - 12/31/17 | $ 200,000.00 | $ 181,950.00 | NYSERDA | 17 Columbia Circle | Albany, NY 12203 | Cheryl Glanton | |
| Ongoing | 1/17/2017 | | $63,000 | $24,425 | National Research Council Canada | Procurement Services, Building M-22, 1200 Montreal Road | Ottawa, Ontario K1A 0R6 | Johnathon Gills | 613-993-5506 |
| Ongoing | 8/10/2015 | | $ 24,357.00 | $ 24,357.00 | Smart Wires Inc | 201 Spear Street, Suite 1350 | San Francisco, CA 94105 Attn: Contracts | | |
| Draft | | | $ 50,000.00 | $ 50,000.00 | CES - IRENA Subcontractor Agreement | 1528 Walnut Street, 22nd Floor | Philadelphia, PA 19102 | Edward F. Toppi | 215-875-9440 |

Margin Adjusted Contract Value

| | | | | | |
|---|---|---|---|---|---|
| Typical Consulting Margin | 10% | >>>>>>>>>>>> | | $ 28,273 | |

| Value Summary | Value ea | ea | $ |
|---|---|---|---|
| Contracts | | | $ 28,273 |
| Enovation required servers | 1000 | 36 | $ 36,000 |
| Extra servers purchased by Enovation | 500 | 72 | $ 36,000 |
| Desks and office contents | | | $ 20,000 |
| 10 used laptops | 500 | 10 | $ 5,000 |
| Goodwill | | | $ 74,727 |
| **TOTAL** | | | **$ 200,000** |

Alevo Analytics has one agreement by which it provides services but the contract is not profitable, and the Debtor would seek to reject the contract.

| Email | Fax | Type | Scope of Work |
|---|---|---|---|
| | | | Quantify the indicative size of distributed energy storage that can add maximum benefit to the ratepayers in Bermuda. |
| | | Energy Storage Sizing SOW | Technology agnostic study which will provide actionable intelligence regarding the potential value streams that distributed energy storage can provide over the log term |
| | 518-862-1091 | Fee Based Services Agreement | 1. Idenfity Ranges of Energy Storage that would provide net benefit to ratepayers for addressing specific electric system needs under a set of scenarios<br>2. Idenfity programmatic interventions and policies consistent with REV (reforming of energy vision) that could accelerate this market<br><br>Objectives are to determine ranges of energy storage that could result in net positive benefit to ratepayers and indentify planning and policy needs |
| | | SOW w/Milestones | Energy Storage Analysis for the provinces of Ontario and Alberta Study |
| etoppi@cel-ltd.com | | Contract Webpage System Level Tools/SS Emulator | Consultancy services for electricity storage for renewable power<br>Development of a global valuation framework |