## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON SALEM DIVISION

**IN RE:**

**ALEVO MANUFACTURING, INC.,** *et al.*,

    **DEBTORS.**

**CASE NO. 17-50877**
**(CONSOLIDATED FOR PURPOSES OF**
**ADMINISTRATION ONLY)**
**CHAPTER 11**

## MOTION BY THE DEBTORS FOR AUTHORITY TO
## SELL EQUIPMENT AND OTHER TANGIBLE PERSONAL PROPERTY ASSETS
## FREE AND CLEAR OF INTERESTS, CLAIMS AND LIENS AND
## EMPLOY AND COMPENSATE LIQUIDATOR

COME NOW Alevo USA, Inc. and Alevo Manufacturing, Inc. (the "Debtors") in this chapter 11 case and apply to this Court under sections 363(f), 327 and 328 of the Bankruptcy Code for approval to sell the Debtors' equipment and other tangible personal property, including inventory, free and clear of claims, liens and interests, and employ a contractual joint venture composed of Hilco Industrial, LLC, Branford, Auctions, LLC, and Joseph Finn Co., Inc. (collectively referred to as "Hilco"). In support thereof, the Debtors show the Court as follows:

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 363(b), (f), (m) and 327(a) of the Bankruptcy Code.

3.      On August 18, 2017 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to control and oversee their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 1, 2017, the Court appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") in the chapter 11 case filed by Alevo Manufacturing, Inc. ("Manufacturing").

*Background of Cases*

6.      Manufacturing began operations in Concord, North Carolina in 2014, and is engaged in the production of grid-scale energy management solutions. Manufacturing provides these solutions through the Alevo GridBank$^{TM}$ ("GridBank"), a patented battery-based energy storage technology.  Alevo USA, Inc. ("USA") performs administrative functions for its subsidiary companies and Manufacturing.

7.      The Debtors obtained post-petition loans ("the DIP Loans") from Bootsmead LeaseCo, LLC (the "Lender"), who is also the landlord of the Concord facility occupied by the Debtors.  As of November 27, 2017, a total of $3,881,000 had been loaned to the Debtors, most of which has been borrowed by Manufacturing, with total borrowing up to $5.7 million.  The DIP Loans are secured by a first lien on all existing and after acquired assets of the Debtors and their subsidiaries that were not otherwise subject to valid pre-bankruptcy liens.

8.      Jonas & Redmann Automationstechnik GmbH ("J&R") has asserted a lien on certain equipment that is part of the production line.  The amount of the J&R claim is undetermined, and Manufacturing has filed an adversary proceeding to avoid the lien.

9.      Immediately before the chapter 11 cases, Alevo Group, SA loaned $660,000 to the Debtors secured by a lien on most assets of the Debtors.  Alevo Group, SA agreed to subordinate its lien on assets of the Debtors to the DIP Loans.

10.      The Debtors have explored sale of their assets through liquidators and investment banks, and even filed a motion to employ an investment banker, but it has become more clear

during the chapter 11 case that Manufacturing cannot achieve a sale of its production line to an end user without such user being able to acquire the intellectual property and other related assets needed to be able to produce and sell the GridBank.

11.    Alevo Group, SA, the parent entity of the Debtors, and Alevo International, SA, an affiliate of the Debtors and holder of the intellectual property, are involved in a Swiss insolvency proceeding.   Depending on the outcome of the foreign proceedings, the availability of the intellectual property and other assets which are the subject of the foreign proceedings for marketing and joint sale is uncertain and outside the control of the Debtors.

12.    Therefore, the Debtors will proceed with liquidation of assets at the Concord facility.  If, during the sale process, a solution evolves with the Parent Companies that would enable a sale of the intellectual property and the Debtor's assets, the auction will be cancelled under terms agreed with Hilco.

*Proposal for Employment of Hilco*

13.    The Debtors wish to employ Hilco because of its experience and qualifications. Members of the Hilco joint venture are successful international industrial auctioneers, liquidators and appraisers.   Members of the Hilco joint venture specialize in accurately valuing, and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction and liquidation sales.  Together, the Hilco joint venture will combine their talents to achieve the best and highest value.

14.    The Debtors selected Hilco after considering proposals from several other liquidators, and Hilco was chosen because of its reputation, interest, diligence in understanding the Debtors' assets, and the competiveness of its proposal regarding expenses, commission and the "break up" fee.

15.    Hilco will perform the following services:

(i)    develop an advertising and marketing plan for the sale of the Assets[1];

(ii)    implement the advertising and marketing plan as deemed necessary or appropriate by Hilco to maximize the net recovery on the Assets;

(iii)    prepare for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco's judgment would be designed to enhance the net recovery on the Assets;

(iv)    provide fully qualified and experienced personnel who will prepare for and sell the Assets in accordance with the terms of the AMA;

(v)    provide a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and the Company with a complete accounting of all Assets sold at the auction

(vi)    sell the Assets for cash or other immediately available funds to the highest bidder(s) on an "AS IS," "WHERE IS" and "all sales are final" basis and in accordance with the terms of the AMA;

(vii)    charge and collect on behalf of Company from all purchasers any purchase price together with all applicable taxes in connection therewith;

(viii)    deposit all collected Gross Proceeds, less any amounts due to Hilco hereunder, into a separate account maintained by Hilco and remit such proceeds to the Company or to Bootsmeade LeaseCo, LLC (also the post-petition lender to the Debtor, the "DIP Lender") as agreed by the parties or ordered by the Court.  "Gross Proceeds" shall be defined as cumulative collected gross receipts from the sale of the Assets, exclusive of sales taxes and buyer's premiums; and

(ix)    submit an initial sales report to the Company within fourteen (14) days after the sale of the Assets and a final complete sales report to the Company within fourteen days after the end of the sale.

16.    In return for the services enumerated in the AMA, Hilco will receive payment form

the Gross Proceeds of $75,000 representing the amount Hilco will be reimbursed for all reasonable

expenses, such as all advertising, promotion and sales costs, lodging, travel, labor and other costs

---

1  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Asset Marketing Agreement, dated November 29, 2017 attached hereto as Exhibit A (the "AMA").

and expenses ("Expense Budget").  The reimbursable Expense Budget can only be exceeded with the consent of the Debtors and Lender.  Regarding allocation of the Expense Budget between USA and Manufacturing, USA should have few assets, if any, included in the sale, but will pay its pro-rata share of expenses depending upon the Gross Proceeds available to the Debtors.

17.     The commission on sale of the assets will be paid through a "Buyers Premium" of 16%, an industry standard commission paid by the buyers to Hilco upon the amount of the highest bid(s).

18.     If the Debtors are able to locate a buyer that intends to resume production of the GridBank, or if the Lender submits a credit bid to acquire all the assets prior to the auction, the Debtors may terminate the Agreement in exchange for payment to Hilco of (i) a $100,000 termination fee plus (ii) reimbursement of actual expenses incurred through the date of termination, up to but not exceeding the Expense Budget.

19.     An auction sale will occur no later than January 31, 2018, and Hilco will direct any purchasers to remove the purchased assets from the premises within thirty (30) days after the sale, unless otherwise agreed by the Landlord.  It is possible that parties will make very attractive offers to Hilco to purchase certain of the assets prior to the auction, and if such an offer occurs, Hilco will consult with the Debtors and any lienholders to determine whether such offer should be accepted and closed.  This approach is known as sale by private treaty.

20.     In any event, the Lender, as landlord of the Concord premises will permit Hilco and buyers of the assets to remove the assets through thirty days after the sale.

21.     To the best of the Debtors' knowledge, the Auctioneer is a disinterested party and has no connection with the creditors or any other party in interest or their respective attorneys. Declarations of the Hilco joint venture members are attached hereto as Exhibit B.

22.     The Debtors seek approval of Hilco under 11 U.S.C. §§ 327 and 328, and the Debtors request that the Court approve the payment of all fees and reimbursement of expenses hereunder to Hilco under section 328(a) of the Bankruptcy Code free and clear of all liens, claims and encumbrances; that all such payment of fees and reimbursement of expenses shall be made without further order of the Bankruptcy Court and in accordance with the AMA; that Hilco is not required to maintain time records or file interim or final fee applications; and that Hilco is authorized to provide the services to the Debtors without the necessity of compliance with any federal, state or local statute or ordinance, contractual provision or licensing requirement affecting store and plant closings, "going out of business," bulk transfers, liquidation or auction sales, or regulating advertising, including signs, banners, or posting of signage.

23.     The AMA provides that the Debtors agree to indemnify and hold Hilco harmless, unless caused by Hilco's bad faith, fraud or gross negligence, from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable attorney's fees) of any kind arising from or related to (i) the Debtors' breach of any of its obligations, representations and warranties hereunder, (ii) its performance or failure to perform hereunder, or (iii) the Debtors' failure to pay any personal property taxes associated with the Assets.  The Debtors further agree to indemnify and hold Hilco harmless (unless caused by Hilco's bad faith, fraud or gross negligence) from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable attorney's fees) of any kind arising from or related to the demonstration and sale of the assets or any inaccurate statements or representations concerning the assets made by the Debtors to Hilco.

24.     Hilco will indemnify and hold the Debtors harmless, unless caused by Debtors' bad faith, fraud or gross negligence, from any and all claims, causes of actions, damages, losses, or

liabilities (including, without limitation, reasonable attorney's fees) (i) by any buyer or prospective buyer of the assets based on Hilco's breach of any of its obligations, representations or warranties hereunder or its performance or failure to perform hereunder or (ii) arising from or related to Hilco's breach of any of its obligations, representations or warranties hereunder or Hilco's gross negligence or willful misconduct.

*Sale Free and Clear of Interests*

25.    The Debtors seek approval of this Court for sale of the assets free and clear of interests, including liens of any nature.  The Lender and Alevo Group, SA have agreed to the transfer of their liens to the proceeds of sale.  Even though Jonas & Redmann's purported lien on certain equipment may not be resolved before the auction, any proceeds of the Jonas & Redmann equipment will be segregated and held for the benefit of Jonas & Redmann pending resolution of the Adversary Proceeding filed by Manufacturing to resolve the lien.  Hilco will be made aware of the importance of clearly identifying and tracking the equipment.  Because the lien held by Jonas & Redmann is in bona fide dispute, the Debtors believe that under section 363 (f), the equipment claims by Jonas & Redmann can be sold free and clear of its alleged lien.

26.    Under North Carolina law, the personal property taxes owed by the Debtors for 2016 are not a lien on the assets, and Hilco is not required to segregate any funds from the sales proceeds for the benefit of Cabarrus County.

27.    If further orders of the Court are required regarding any aspect of the auction, the Debtors will seek relief from this Court after consultation with Hilco, the Lender, and the Committee.

WHEREFORE, the Debtors move for entry of an order:

1.    Approving the AMA and the sale of the Debtors' tangible personal property under

the terms and conditions set forth in the AMA;

     2.    Approving the sale of the Assets free and clear of interest, including liens, with the interests and  liens transferred to the proceeds of sale;

     3.    Approving the Debtors' employment of Hilco as the liquidator as set forth herein and in the AMA attached as Exhibit A; and

     4.    Such other and further relief as this Court may deem appropriate.

This 29th day of November, 2017.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Terri L. Gardner*
Terri L. Gardner
N.C. State Bar No. 9809
4140 Parklake Avenue
GlenLake One, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 329-3882
Facsimile: (919) 329-3799
Email: terri.gardner@nelsonmullins.com

*Counsel for Alevo USA, Inc. and Alevo Manufacturing, Inc.*

**EXHIBIT A**

# ASSET MARKETING AGREEMENT

This Asset Marketing Agreement (this "Agreement") is dated as of the ___ day of December, 2017, by and among a contractual joint venture composed of Hilco Industrial, LLC, Branford Auctions, LLC and Joseph Finn Co., Inc. (collectively referred to as, "Hilco"), Alevo USA, Inc., f/k/a Alevo, Inc., ("Alevo USA") and Alevo Manufacturing, Inc. ("Alevo Manufacturing", and together with Alevo USA, the "Company").

WHEREAS, Alevo USA and Alevo Manufacturing are each debtors in Chapter 11 cases (the "Chapter 11 Cases") filed on August 18, 2017, under Chapter 11, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court").

WHEREAS, Hilco is in the business of marketing and selling assets on behalf of its clients. The Company is the owner and possessor of certain assets and desires to engage Hilco as its exclusive agent to sell such assets as more fully described herein.

WHEREAS, as a result of a competitive search, which included evaluating the proposed liquidators' marketing and auctioneering capabilities, product knowledge, involvement and commitment of principals, technology, sales methodologies and references, the Company has selected and desires to engage Hilco as its exclusive agent to sell the assets as more fully described herein; and

WHEREAS, substantially contemporaneously with the date hereof, the Company will file a motion with the Bankruptcy Court seeking authority to sell certain of its assets and retain and employ Hilco as liquidator to sell such assets without further court approval and for Hilco to be compensated and reimbursed in accordance with this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual agreements and covenants contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, Hilco and the Company (individually, each a "Party," and together, the "Parties") do hereby agree as follows:

## I.      Engagement and Agreement to Market Assets

A.      The Company hereby engages Hilco as its exclusive marketing and sales agent, and Hilco hereby accepts such engagement, with respect to (but not limited to) certain assets identified in Exhibit A attached hereto and by this reference incorporated herein, (the "Assets") located at 2321 Concord Parkway South, Concord, North Carolina (the "Location").   Fixtures owned by the DIP Lender (as defined below) will not be sold, and Hilco will walk through the Location with the Landlord to delineate clearly which assets are not property of the Company to be sold.

B.      For purposes of selling the Assets, Hilco shall utilize private treaty sales, global webcast auctions, and such other sale strategies as the Company and Hilco mutually agree and in such a way that maximizes value.

## II.     Exclusivity

In order to permit successful marketing and sale of the Assets, the Company grants to Hilco the exclusive right to sell the Assets for a period beginning on the date hereof (the "Commencement Date") and continuing until ninety days from entry of Retention Order (as defined below) (such period, the "Term"), provided that, Hilco agrees to conduct an auction for the Assets by January 31, 2018 and will direct any buyers to remove such Assets from the Location by the end of the Term unless the DIP Lender agrees otherwise.  The Company acknowledges that Hilco or its affiliated entities and partners may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement.  All inquiries regarding the Assets made to the Company, its representatives or related parties to the Company, shall be redirected to Hilco.

## III.     Method of Sale and Certain Covenants

A.     In connection with the services to be provided by Hilco hereunder, Hilco will:

(i)      develop an advertising and marketing plan for the sale of the Assets;

(ii)     implement the advertising and marketing plan as deemed necessary or appropriate by Hilco to maximize the net recovery on the Assets;

(iii)    prepare for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco's judgment would be designed to enhance the net recovery on the Assets;

(iv)    provide fully qualified and experienced personnel who will prepare for and sell the Assets in accordance with the terms of this Agreement;

(v)     provide a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and the Company with a complete accounting of all Assets sold at the auction

(vi)    sell the Assets for cash or other immediately available funds to the highest bidder(s) on an "AS IS," "WHERE IS" and "all sales are final" basis and in accordance with the terms of this Agreement;

(vii)   charge and collect on behalf of Company from all purchasers any purchase price together with all applicable taxes in connection therewith;

(viii)  deposit all collected Gross Proceeds, less any amounts due to Hilco hereunder, into a separate account maintained by Hilco and remit such proceeds to the Company or to Bootsmeade LeaseCo, LLC (also the post-petition lender to the Debtor, the "DIP Lender")) as agreed by the parties or ordered by the Court.  "Gross Proceeds" shall be defined as cumulative

collected gross receipts from the sale of the Assets, exclusive of sales taxes and buyer's premiums; and

(ix)    submit an initial sales report to the Company and DIP Lender within fourteen (14) days after the sale of the Assets and a final complete sales report to the Company and DIP Lender within fourteen days after the end of the Term.

B.    In connection with the services to be provided by Hilco hereunder, the Company hereby grants to Hilco the following rights and authority:

(i)    The Company hereby grants Hilco a license to use the name "Alevo" and similar derivations in all of its advertising and promotional activities related to this Agreement. Hilco's license to use such name shall continue until the end of the Term of this Agreement.

(ii)    The Company hereby grants Hilco a license to allow Hilco to enter and use the Location. Specifically, Hilco shall have the right to enter and use the Location during the Term solely for the purposes of performing its obligations under this Agreement, including (without limitation) taking photographs and preparing the marketing material for the Assets, and selling and overseeing the removal of the Assets. Hilco shall have quiet enjoyment of the Location during its use of the Location with no interference from any labor unions or any other third parties. Hilco will use the Location as licensee and shall not be obligated to pay any rent, taxes, utilities, or other charges therefore. The Company agrees to continue to provide and pay for all utilities, including, but not limited to, heat, lights, power, phone and data lines and water) during the course of Hilco's use. The Company agrees to maintain and bear the cost of security personnel at the Location as well as provide for snow removal and maintenance during the term of this Agreement. The Company acknowledges that Hilco is not an insurer of the Company's personal property. Hilco shall have the right to abandon at the Location any Asset not removed by end of Term.

(iii)    The parties hereto agree, and the Company hereby expressly acknowledges, that Hilco shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found at the Location or in the Assets or obtaining or maintaining any Environmental Permits. The Company shall be responsible for ensuring that the Company possesses and is in compliance with all Environmental Permits that are required for the operation of the Company's business. As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under

3

or are issued pursuant to Environmental Laws. The Company hereby agrees to defend, indemnify and hold Hilco harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with any hazardous chemicals, solvents or substances found at the Location or in the Assets, Environmental Laws or Environmental Permits. Subject to and without limiting the foregoing, Hilco will use commercially reasonable efforts to prevent any violation of Environmental Laws by Hilco.

(iv)     The Company acknowledges that with respect to any export transaction involving any of the Assets sold hereunder, and unless the Company and purchaser agree otherwise, the Company shall be the United States principal party in interest. Accordingly, the Company authorizes Hilco to provide the Company's federal employer identification number ('EIN') to purchasers, their agents, customs officials or similar parties for the purposes of completing a Shipper's Export Declaration form or any documentation necessary to facilitate the respective purchaser's export of the purchased Assets.

## IV.     Commission Payable to Hilco; Expense Reimbursement

A.     In consideration of its services hereunder, Hilco shall be entitled to charge and retain for its own account an industry standard buyer's premium of sixteen percent (16%) of the Gross Proceeds for Assets that are sold. For purposes of clarification, the buyer's premium is a fee charged in addition to the sale price of the Assets and is paid for by the buyer. All buyer's premiums shall be withheld by Hilco upon collection of proceeds from applicable buyer(s). No buyer's premium is due with respect to a credit bid by the DIP Lender of all or part of its loan

B.     Notwithstanding the foregoing, to the extent that the Company sells the Assets to a going concern buyer that will operate the Assets or to the extent that the DIP Lender credit bids its debt and acquires or controls the disposition of the Assets prior to a scheduled auction by Hilco, Hilco will allow this Agreement to be terminated in exchange for a $100,000 fee plus reimbursement of any actual advanced expenses capped at no greater than $75,000 as discussed below (the "Termination Fee"). The Termination Fee shall be paid simultaneous with a closing of an alternative transaction.

C.     Hilco will advance and the Company shall be obligated to reimburse Hilco for all Expenses regardless of whether or not any Assets are sold, provided that the Expenses shall not exceed Seventy-Five Thousand Dollars ($75,000.00) without the Company's and DIP Lender's prior written consent. "Expenses" mean reasonable expenses incurred by Hilco in connection with Hilco's performance of its services hereunder, including, but not limited to, advertising, promotion and sales costs, lodging, travel, labor associated with project management oversight, labor and other costs and expenses associated with previewing and removing the Assets, and other miscellaneous costs and expenses. In the event that walls or other structures must be removed or modified to remove any Asset sold, (i) such modification or removal can only be done with the prior written approval of the DIP Lender, such approval to be provided or not provided in the DIP Lender's sole and absolute discretion and (ii) all supervision and expense of such removal and

4

modification shall be borne directly by the Company and is not included in the Expenses. Dumpsters for refuse removal are also not included in Expenses. To the extent not advanced, the Company and the DIP Lender agree that all Expenses may be withheld from Gross Proceeds of the sale of any Assets or such amounts shall be paid by the DIP Lender in the event of a credit bid and there is insufficient Gross Proceeds to pay such Expenses. Hilco agrees to use the same level of discretion and judgment in incurring expenses under this Agreement as it does in incurring non-reimbursable expenses in its own internal operations and business.

**V.      Representations and Covenants of the Company and Hilco**

A.      The Company represents and warrants to Hilco and covenants that: (i) the Company has all legal right and authority to sell the Assets, (ii) subject to entry of the Retention Order, the Company has taken all necessary actions required to authorize the execution, delivery and performance of this Agreement and the related documents contemplated hereby, and no further consent or approval is required for the Company to enter into and deliver the Agreement and to perform its obligations under the Agreement, (iii) Company has the authority to grant the license to Hilco to utilize the Location and to use the name "Alevo" as provided for under this Agreement, (iv) Hilco shall have access to the Assets and the Location in accordance with this Agreement; (v) the Asset representations and descriptions on Exhibit A are accurate, true and complete to the best of the knowledge of the Company, and the Assets are, and will be maintained, in the same condition as the Assets existed on Hilco's last inspection (ordinary wear and tear excepted); and (vi) subject to approval of the Bankruptcy Court, all Assets shall be conveyed to third party purchasers free and clear of all liens, claims, encumbrances, and interests. The Company further represents and warrants to Hilco that any amounts due and payable hereunder shall be free and clear of any liens, claims, or encumbrances of any kind whatsoever.

B.      Hilco represents and warrants to Company that (i) Hilco is duly organized, validly existing and in good standing and (ii) Hilco has taken all necessary actions required to authorize the execution, delivery and performance of this Agreement and the related documents contemplated hereby, and no further consent or approval is required for Hilco to enter into and deliver the Agreement and to perform its obligations under the Agreement.

**VI.      Indemnification**

A.      The Company hereby agrees to indemnify and hold Hilco harmless, unless caused by Hilco's bad faith, fraud or gross negligence, from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable attorney's fees) of any kind arising from or related to (i) the Company's breach of any of its obligations, representations and warranties hereunder, (ii) its performance or failure to perform hereunder, or (iii) the Company's failure to pay any personal property taxes associated with the Assets. The Company further agrees to indemnify and hold Hilco harmless from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable attorney's fees) of any kind arising from or related to the demonstration and sale of the Assets or any inaccurate statements or representations concerning the Assets made by the Company to Hilco.

B.      Hilco hereby agrees to indemnify and hold the Company harmless, unless caused by Company's bad faith, fraud or gross negligence, from any and all claims, causes of actions,

damages, losses, or liabilities (including, without limitation, reasonable attorney's fees) (i) by any buyer or prospective buyer of the Assets based on Hilco's breach of any of its obligations, representations or warranties hereunder or its performance or failure to perform hereunder or (ii) arising from or related to Hilco's breach of any of its obligations, representations or warranties hereunder or Hilco's gross negligence or willful misconduct.

## VII.    Insurance

The Company agrees to procure and maintain, during the Term of this Agreement, fire, liability and other perils insurance in appropriate amounts in respect of all Assets until sold and removed from the Location.

## VIII.   Personal Property Taxes

Hilco shall not be responsible or liable for the payment of any personal property taxes associated with the Assets.

## IX.    General Provisions

A.     Hilco shall not subcontract the whole of its obligations under this Agreement, but shall be permitted to utilize independent contractors and subcontractors for performing various obligations, including (without limitation) as part of the auction crew and overseeing the removal of the Assets.  Should Hilco utilize third party contractors then Hilco shall be responsible for the related fees and costs, subject to reimbursement by the Company of such fees and costs as Expenses (which are subject to the cap set forth in Section IV.C.).

B.     This Agreement constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

C.     Hilco shall be entitled to compensation for services rendered under this Agreement as outlined above and this Agreement shall be binding upon the Company or any successor or assignee.

D.     The parties hereto agree, and the Company hereby expressly acknowledges, that Hilco has not guaranteed the Company any return from the sale of the Assets.

E.     The Company and Hilco shall deal with each other fairly and in good faith so as to allow both parties to perform its duties and earn the benefits of this Agreement.

F.     TECHNOLOGY DISCLAIMER:  HILCO DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN ANY WEBSITE USED IN CONNECTION WITH THE SALE OF THE ASSETS, INCLUDING ANY THIRD-PARTY SOFTWARE, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH ANY SUCH WEBSITE, WILL BE TIMELY, SECURE, UNINTERRUPTED, OR THAT DEFECTS WILL BE CORRECTED.

G.     The Company recognizes and acknowledges that the services to be provided by Hilco pursuant to this Agreement are, in general, transactional in nature, and Hilco will not be billing the Company by the hour nor maintaining time records.  It is agreed that Hilco is not requested or required to maintain such time records and that its compensation will be fixed on the percentages set forth herein.  Hilco represents and warrants that it has the expertise in performing the services under this Agreement.

H.     Any correspondence or required notice shall be addressed as follows:

If to Hilco:

Hilco Industrial, LLC
5 Revere Drive, Suite 206
Northbrook, Illinois 60062
Tel.: (847) 509-1100
Fax:  (847) 897-0868
Email: rlawlor@hilcoglobal.com
Attn:  Ryan Lawlor

with a copy to:

Malfitano Partners
747 Third Avenue, 2nd Floor
New York, NY 10017
Tel.: (646) 776-0155
Email: jm@malfitanopartners.com
Attn:  Joseph Malfitano

If to the Company:

Alevo Manufacturing, Inc.
Alevo USA, Inc.
2322 Concord Parkway South
Concord, North Carolina  28027
Email:  Peter.heintzelman@alevo.com
Attn: Peter Heintzelman

With a copy to:

Terri L. Gardner
4140 Parklake Avenue, Suite 200
Glenlake One
Raleigh, North Carolina  27615
Email:  terri.gardner@nelsonmullins.com

I.     This Agreement shall be deemed drafted by the parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

J.     By executing or otherwise accepting this Agreement, the Company and Hilco acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

K.    The Company shall provide Hilco with:

- all reasonably requested Asset information to the extent in the Company's possession;

- titles, if applicable, to all of the Assets; and

- information on prospect interest and evidence of all Asset inquiries, to the extent that the Company has such information and evidence.

L.    This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

M.    This Agreement creates no third-party beneficiaries.

N.    This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to conflict of law's provisions.

## X.    Miscellaneous

This Agreement may not be transferred or assigned without the express written consent of the other Parties, provided that Hilco shall be permitted to joint venture with certain third parties. This Agreement does not create, and shall not be construed as creating, any rights enforceable by any person not a Party to this Agreement. The Parties hereto are acting as independent contractors and nothing contained herein shall be deemed to create any other type of partnership, joint venturer or other relationship. This Agreement may not be modified or amended except by an instrument in writing executed by an authorized representative of each party to this Agreement. If any part or subpart of this agreement is found or held to be invalid, that invalidity shall not affect the enforceability and binding nature of any other part of this agreement. No Party shall be considered in default hereunder to the extent that performance by such Party is prevented or delayed by any cause, existing or future, which is beyond the reasonable control of such Party.

## XI.    Retention Order

The effectiveness of this Agreement is subject to and contingent upon the entry of an order under section 327 and 328 of the Bankruptcy Code, in form and substance acceptable to Hilco in its sole discretion, authorizing the Company's entry into and approval of this Agreement (the "Retention Order"), which the Company agrees to use the Company's best efforts to promptly obtain following the execution hereof (including seeking authority to sell the Assets). The Company will use the Company's best efforts to ensure that the Retention Order shall specifically provide that: (i) Hilco is being retained pursuant to sections 327 and 328 of the Bankruptcy Code by the Company; (ii) the payment of all fees and reimbursement of expenses hereunder to Hilco is approved under section 328(a) of the Bankruptcy Code and shall be free and clear of all liens, claims and encumbrances; (iii) all such payments of fees and reimbursement of expenses shall be made without further order of the Bankruptcy Court and in accordance with this Agreement; (iv) Hilco is not required to maintain time records or file interim or final fee applications; and (v) Hilco is authorized to provide the Services without the necessity of compliance with any federal, state or

8

local statute or ordinance, contractual provision or licensing requirement affecting store and plant closings, "going out of business," bulk transfers, liquidation or auction sales, or regulating advertising, including signs, banners, or posting of signage.

\*　　　\*　　　\*

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date written below.

**ALEVO USA, INC.**

_____

By:
Title:

Date: _____

**ALEVO MANUFACTURING, INC.**

_____

By:
Title:
Date: _____

**BOOTSMEADE LEASECO, LLC**

_____

By:
Title:
Date: _____

**HILCO INDUSTRIAL, LLC**
**On behalf of itself and its joint venture partners**

_____

By:    Ryan Lawlor
Title:   VP & Assistant General Counsel, Managing Member
Date:   _____

10

# EXHIBIT A

## ASSETS

**All Alevo assets, wall to wall, floor to ceiling including but not limited to the following;**

**Anode**
Anode Mixing Room
Anode Coating Line
Anode Blanking & Sorting Line
Anode Welding Line

**Cathode**
Cathode Mixing Room
Cathode Coating Line
Cathode Blanking & Sorting Line
Cathode Welding

**Cell Assembly**
Cell Assembly Pouching
Cell Assembly Stacking
Cell Assembly Pin Welding
Cell Assembly Can Assembly
Cell Assembly Can Welding
Cell Assembly Leak Tester
Cell Assembly Modular Assembly
Cell Assembly Steel Band Welding
Cell Assembly Drying
Cell Fill EMM
Cell Fill Electrolite Filling Station
Cell Fill Conveyor

**Formation**
Solith Sovel Sovema Formation Line, (2015), 26-Charging Modules, (6mm New)
(2) Skilled Euro Impianti Automated Guided Vehicles, (2015), Forklifts
(2) MJC ATO48022 Air Chillers/Make Up Units (2017)

**Final Set Up**
(3) Bushman 100,000-Capacity Transfer Cars, 45'L x 9'W (745k New)

Robotic Set-Up Cell with Fanuc M-710i, Conveyors, Programmable Nut Runners, etc.

**Acetone Processing**
Tank, Glass Lined (R110)

(4) Large Pressure Vessels for Premix (B200-F40, F-41), Associated Pumps, Valves, etc.
(2) Smaller Pressure Vessels for Premix, Associated Pumps, Valves, etc.

**Outside**
Acetone Storage & Delivery System (1994)
CAT 550-KW Diesel Generator (2016)
Genie Scissor Lift
(2) Pressure Vessels w/Agitators, Portable to Transfer Slurry
Miscellaneous Process Related Equipment
SO2 Scrubber System, Skid Mounted
CAT D150-8 150-KW Diesel Generator, S/N CAT00C66LLC600511 (2015), 480/277-Volt, 225-Amp, 3/60, Mounted on Diesel Tank, Sound Enclosure
Utility Water Tank, 12,000-Gallon (Approx), 316-SS, with Pump
Combilift 100,000-Lb Straddle Lift (268k New)
CAT 350-KW Diesel Generator (2016), 480/277-Volt, 225-Amp, 3/60, Mounted on Diesel Tank, Sound Enclosure
(2) Tempest Chillers, Skid Mounted
Bender Pressure Vessel (2015), L961
Bender Pressure Vessel (2015), L991
Bender Pressure Vessel (2015), R110-B02
Bender Pressure Vessel (2015)

Schedule A- Alevo (003).xlsx

Scrubber System (Not Complete)
Structural Steel Support Structure

## New Building

Safe Rack G4 Series Truck Load/Unload Gangway (2015, Never Used)
DE Dietrich 19,500-Gallon Glass Lined Holding Tank (B203)
(3) DE Dietrich 19,500-Gallon Glass Lined Holding Tanks
(2) DE Dietrich 300-Gallon Glass Lined Holding Tanks
Aaon 5-Ton Chiller
Hercules II 750 Series Handicap Elevator

## Warehouse

Z Magazzini Zecchetti Traslo HHB133/500F2 ASRS Robot (2015)

## Electrical Room & Spares

Lot - Approx 300' of Bus Duct, Switchgear, Transformer, etc., Installed 2016
(5) Parker AC/DC 2-MW Inverters (2016, Never Used)
(7) DC Bolt Switch Disconnects
(4) Stulz Chillers
MRO Pallet System
Approximately (300) Vidmar Cabinets (Empty)

## Miscellaneous

Loose Process Related Material and Equipment Throughout Facility
(2) Carrier Chillers, RTO, Compressors
Dell Power Edge Server and switch, Office Equipment and Furniture
Inventory and Raw Material
Inspection Equipment, Labs, CMM, Lasers, Machine Shop Equipment
Forklifts, Mobile Carts, Pallet Jacks, Company Vehicles, Mobile Assets
(6) Grid Bank Housing Structures, with Chillers
Pumps, Motors, Valves, Gas Monitors, Etc

Schedule A- Alevo (003).xlsx

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON SALEM DIVISION**

IN RE:

**ALEVO MANUFACTURING, INC.,** *et al.*,   **CASE NO. 17-50877**
**(CONSOLIDATED FOR PURPOSES OF**
**DEBTORS.**                      **ADMINISTRATION ONLY)**
**CHAPTER 11**

  I, James Gardner, make this declaration under 28 U.S.C. § 1746, and states the following:

1.  I am over 18 and competent to testify.  I am a partner of Branford Auctions, LLC

("Branford").  I am authorized to make and submit this declaration (the "Declaration") on behalf

of Branford in support of the Motion by the Debtors for Authority to Sell Equipment and other

Tangible Personal Property Assets Free and clear of Interests and Liens and Employ and

Compensate Liquidator (the "Motion").

2.  The facts set forth in this Declaration are based upon my personal knowledge,

information and belief, or client matter records kept in the ordinary course of business that were

reviewed either by me or other employees of Branford under my supervision and direction.  If

called and sworn as a witness, I could and would testify competently to the facts set forth herein.

3.  In the ordinary course of its business, Branford and its affiliates maintains a database for

purposes of performing "conflicts checks."  The database contains information regarding its

present and past representations and transactions.  I obtained a list of the above-captioned

debtors and debtors in possession (the "Debtors"), certain of the Debtors' creditors, and other

parties in interest in the above-captioned cases from Debtors' counsel for purposes of searching

the aforementioned database and determining the connection(s) which Branford or its affiliates

has with such entities.

3.  Branford searched the aforementioned database for the parties in interest identified.

4.      Other than the joint venture relationship with Hilco Industrial, LLC and Joseph Finn Co., Inc., Branford's search of the aforementioned database did not identify any connections.

5.      Other than sharing with the other joint venture partners, neither I, Branford, nor any principal, partner, director, officer, or employee thereof, nor any professional retained by Branford has agreed to share or will share any portion of the compensation to be received from the Debtor by Branford with any other person other than the principals and regular employees of Branford.

6.      To the best of my knowledge, neither I, Branford, nor any principal, partner, director, officer, or employee thereof, nor any professional retained by Branford, insofar as I have been able to ascertain, holds or represents any interest adverse to the Debtors or their estates with respect to the matter(s) upon which Branford is engaged.

7.      Neither I, Branford, nor any principal, partner, director, officer, or employee thereof, nor professional retained by Branford, insofar as I have been able to ascertain, is (or within two (2) years before the date the Debtors filed these chapter 11 cases, a director or officer of the Debtors.

8.      To the best of my knowledge, Branford is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

9.      Branford is conducting further inquiries regarding Branford's retention by any creditors of the Debtors, and upon conclusion of that inquiry, or at any time during the period of Branford's engagement if Branford should discover any facts bearing on the matters described herein, Branford will supplement the information contained in this Declaration.

**[SIGNATURE PAGE FOLLOWS]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: November 28, 2017

By: _____

Name: James Gardner

Title: Partner

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON SALEM DIVISION**

**IN RE:**

| | |
|---|---|
| **ALEVO MANUFACTURING, INC.,** *et al.,* | **CASE NO. 17-50877** |
| | **(CONSOLIDATED FOR PURPOSES OF** |
| **DEBTORS.** | **ADMINISTRATION ONLY)** |
| | **CHAPTER 11** |

I, Ross Finn, make this declaration under 28 U.S.C. § 1746, and states the following: 1.

I am over 18 and competent to testify. I am a vice president of Joseph Finn Co., Inc. ("Finn"). I am authorized to make and submit this declaration (the "Declaration") on behalf of Finn in support of the Motion by the Debtors for Authority to Sell Equipment and other Tangible Personal Property Assets Free and clear of Interests and Liens and Employ and Compensate Liquidator (the "Motion").

2.      The facts set forth in this Declaration are based upon my personal knowledge, information and belief, or client matter records kept in the ordinary course of business that were reviewed either by me or other employees of Finn under my supervision and direction. If called and sworn as a witness, I could and would testify competently to the facts set forth herein.

3.      In the ordinary course of its business, Finn and its affiliates maintains a database for purposes of performing "conflicts checks." The database contains information regarding its present and past representations and transactions. I obtained a list of the above-captioned debtors and debtors in possession (the "Debtors"), certain of the Debtors' creditors, and other parties in interest in the above-captioned cases from Debtors' counsel for purposes of searching the aforementioned database and determining the connection(s) which Finn or its affiliates has with such entities.

3.      Finn searched the aforementioned database for the parties in interest identified.

4.      Other than the joint venture relationship with Hilco Industrial, LLC and Joseph Finn Co., Inc., Finn's search of the aforementioned database did not identify any connections.

5.      Other than sharing with the other joint venture partners, neither I, Finn, nor any principal, partner, director, officer, or employee thereof, nor any professional retained by Finn has agreed to share or will share any portion of the compensation to be received from the Debtor by Finn with any other person other than the principals and regular employees of Finn.

6.      To the best of my knowledge, neither I, Finn, nor any principal, partner, director, officer, or employee thereof, nor any professional retained by Finn, insofar as I have been able to ascertain, holds or represents any interest adverse to the Debtors or their estates with respect to the matter(s) upon which Finn is engaged.

7.      Neither I, Finn, nor any principal, partner, director, officer, or employee thereof, nor professional retained by Finn, insofar as I have been able to ascertain, is (or within two (2) years before the date the Debtors filed these chapter 11 cases, a director or officer of the Debtors.

8.      To the best of my knowledge, Finn is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

9.      Finn is conducting further inquiries regarding Finn's retention by any creditors of the Debtors, and upon conclusion of that inquiry, or at any time during the period of Finn's engagement if Finn should discover any facts bearing on the matters described herein, Finn will supplement the information contained in this Declaration.

**[SIGNATURE PAGE FOLLOWS]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: November 2̲5̲, 2017

By: _____

Name: Ross Finn

Title: Vice-President